BYRNES, Judge.
Saul Johnson appeals his conviction and sentence for second degree murder. We affirm.
*80 Defendant originally was charged and found guilty of the first degree murders of Sue Windham and Earline Nunn on March 14, 1986. However, the appellant’s convictions and sentences were vacated on appeal by the Louisiana Supreme Court based on the prosecutor’s improper reference to Johnson’s failure to testify. State v. Johnson, 541 So.2d 818 (La.1989). The Court also noted that while the evidence at trial supported a verdict of first degree murder of Ms. Windham, it only supported a verdict of second degree murder as to Ms. Nunn. Therefore, the Court held that Johnson could only be tried for second degree murder with respect to Ms. Nunn’s death.
On the morning of November 27, 1984, the body of a woman was found in a wooded area just off Michoud Boulevard near its intersection with I — 10. The body was clothed only in a shower cap and blouse. An autopsy revealed three gunshot wounds to the head, and .38 caliber pellets were retrieved from the body. The next day, a second female body was found in a wooded area off of Michoud Boulevard across I — 10 from where the first body was found. The woman had been shot twice in the head at extremely close range. Her body was covered with scratches which occurred shortly before she died and which were consistent with having been made by contact with the various bushes and shrubs in the area where her body was found.
The day after the second body was found, the victims were identified by family members as Sue Windham and Earline Nunn, cousins who lived together on Dryades Street. Saul Johnson was arrested for the murders in February 1985. The police impounded his car, and wedged down in the back seat were a ring which belonged to Ms. Nunn and a broken earring which belonged to Ms. Windham. However, tire impressions taken of the car did not match tire tracks found near the areas where the bodies were found.
At the second trial Geraldine Nunn, Earline’s sister and Sue’s cousin, testified that she lived with the victims for a brief time shortly before they were killed. She testified that Johnson had dated Earline for many years prior to his marriage to another woman in early 1984, and Earline had continued seeing him after the marriage. However, the relationship deteriorated, and by November Earline Nunn had obtained a peace bond against Johnson.
Geraldine Nunn also testified that a few weeks prior to the murders, she was at Earline’s apartment one evening when Johnson arrived. Sue Windham answered the door, and he pushed her aside and went upstairs to Earline’s bedroom where she and Geraldine were watching television. Geraldine testified that Johnson told Earline that she was his woman and that he would come to her house whenever he wanted. He shoved Geraldine, and they struggled, eventually falling to the floor. Geraldine testified that during the struggle, she noticed that Johnson had a .38 caliber gun hidden under his shirt. Geraldine testified that Johnson then sat on a couch and told her that he knew that when he killed Earline, he would also have to kill Sue Windham. He also threatened to run Geraldine out of town. Geraldine identified the ring found in Saul Johnson’s car as belonging to Earline Nunn, who always wore it, and the earring found in the car as belonging to Sue Windham.
Dorothy Johnson, the defendant’s sister-in-law, testified that Saul Johnson, his wife Diane, and their newborn baby appeared at her house late one night near the end of November. Dorothy Johnson testified that the defendant, who had been drinking, told her that he had killed Earline and Sue. Dorothy Johnson related that the defendant told her that he had been at their house, had argued with Earline, and then had knocked out Earline and Sue. He told Dorothy Johnson that he put the victims’ bodies into his car, and when they awoke while he was driving, they began fighting him. The defendant related that he shot Sue Windham while she ran to get away, and then he shot Earline Nunn. Dorothy Johnson testified that she did not believe him at the time because he was known for exaggerating and playing jokes on people. She testified that she became suspicious, however, when she read that the first body *81 had been found, and her suspicions grew when she read that the second body had been found. She did not contact the police, however, because Saul Johnson was her brother-in-law. Dorothy Johnson also stated that the defendant told her to ignore the subpoena to come to trial because he would be able to “get out” if she did not testify, and at the most she would only have to do sixty to ninety days for doing so.
Because Henry Foster was unavailable at the second trial, his testimony was introduced from the defendant’s first trial. Foster testified that he was incarcerated at Orleans Parish Prison with Saul Johnson in February, 1985. The defendant told Foster that he had killed the girls on Dryades Street. A few days after this, the defendant approached Foster and asked him to write a letter for the defendant to an attorney. Foster agreed, and he testified that the letter stated that “Captain Friedman” was the man involved in the murders. About a week after this, Saul Johnson again approached Foster, told him that the defendant had not received a reply from the letter, and told Foster that the defendant had put the gun used in the killings under the house of Sue Windham’s boyfriend. Saul Johnson also dictated another letter to be sent to a friend of Foster, advising the friend to go to the police and tell them that he had seen another man forcing a woman into a car, threatening to kill her like he did “them whores on Dryades Street” if she did not comply. Foster related that Saul Johnson offered to give him and his friend money, and even wrote down his wife’s address and telephone number so that the friend could contact her. However, the money never changed hands, and Foster eventually gave the letter to the police.
Foster further testified that Saul Johnson told him that on the day of the killing he stopped by the victims’ apartment and sold them some marijuana. The defendant stated that he went back later that night to collect the money. Saul Johnson said that Sue Windham met him at the door half nude and told him that she wanted him. The defendant stated that he pulled a gun, there was a struggle, and Ms. Windham was shot. Saul Johnson admitted raping her, and then he shot her two more times. Earline Nunn then came in, and he tied her up. He waited a few hours, placed Sun Windham’s body in the trunk, put Earline Nunn in the car, and drove to Eastern New Orleans. Saul Johnson told Foster that he dumped Sue Windham’s body, and when he got Earline Nunn out of the car, she tried to run. He shot Earline Nunn twice and left her body. The defendant told Foster that he tried to obliterate any tire tracks at the scene, and later he had his nephew change the tires on the car. Saul Johnson also had his nephew clean up the victims’ apartment.
Foster admitted that he was being held in jail on pending charges at the time he talked with Saul Johnson. Foster also admitted that he had other prior felony convictions and he had spent time in the V.A. hospital for alcohol dependency. He testified, however, that he had been sentenced and had served his sentence prior to trial, having been out of jail ten months at the time of the first trial.
John Williams, another inmate who spent time in jail with Saul Johnson, testified that the defendant had mentioned something about a “conflict” with two girls and then had mentioned that some lady had been on her knees praying when he “did her in.” Williams stated that Saul Johnson also asked him if he knew anyone who could kill his wife for him. The defendant told Williams that he had paid someone $1500 to kill her, but that person absconded with the money. Williams testified that the defendant admired Williams’ handwriting and asked him to copy a letter the defendant had written to his mother. Williams agreed, pocketing the letter, but he was moved shortly after this conversation, and he never recopied the letter. Williams later gave it to his attorney. Williams admitted that in exchange for his testimony, he was promised that he would not be multiple billed. He testified that he received a five-year sentence for a guilty plea to his armed robbery charge. He related that he spent time in prison, but he was pardoned in 1988 and had since moved to California. He *82 testified that he voluntarily came back to testify at this trial.
Diane Johnson, the defendant’s wife at the time of the murders, invoked her spousal privilege concerning anything Saul Johnson may have told her. However, she identified various letters as having been written by her husband, identifying his handwriting. She also testified that she remembered going to Dorothy Johnson’s house with the defendant sometime in late November 1984, but she could not hear the conversation between Johnson and his sister-in-law.
The State introduced various letters into evidence. Exhibit S-27 is the letter written by Foster to be sent to his friend, advising the friend to tell the police that he had overheard a man, to be identified as the defendant’s cousin Jerry Chapman, ordering a woman into a car and threatening to kill her “like those whores on Dryades Street” if she did not comply. The letter also provides details as to what was supposed to have happened at the time of the killings, including a possible rape and the killing of Sue Windham and the killing of Ear line Nunn. The letter notes that the gun used to kill these victims was also used to kill a woman near the French Market in 1983 and a man in the Calliope Project in 1984. The letter included advice to Foster’s friend as to how to proceed, and states that the defendant’s wife will deposit money into Foster’s account to pay for his and the friend’s services. The letter contains the address and telephone number of the defendant’s wife, and it also contains an acknowledgement signed by the defendant that the contents are true.
Exhibit S-28 is the letter the defendant gave to Williams to have him recopy into his own handwriting. The letter purports to be a letter to Earline Nunn’s mother from someone who worked with Earline. The letter notes that the writer, who is married to someone who works at court, has been investigating Earline Nunn’s death and has discovered that the relationship between the defendant and Earline was very good. The letter relates that the defendant's wife was “no good” and that the wife did not like Earline. The writer states that she heard that Saul left Diane for Earline, and Diane then took up with Saul’s brother and conspired with Saul’s brother and nephew to kill Earline. The letter notes that the tire tracks found at the scene of Earline’s murder matched the tires on Saul’s brother’s car. The letter ends with a promise to write again when the writer found out any more information and to write a similar letter to Saul.
Exhibit S-29 is a photocopy of a letter which was not included in the exhibits provided on appeal. It was identified during the State’s case as the “Raymond” letter, written by Saul Johnson to his brother Raymond. Apparently, the letter referred to Raymond’s help in cleaning up the victims’ house after the murder. The letter also apparently informed Raymond that Diane told the district attorney’s office that Raymond and a nephew committed the murder, and the letter contains the advice that Raymond “dispose of” Diane.
Exhibits S-32 and S-33 are letters to someone Saul Johnson refers to as his “little brother” Wayne. Both letters concern Wayne’s “taking care of that matter” for Saul. In letter S-32, Saul asks about this matter and then notes that “she” came to court and then wrote to him telling him she was going to “down” him. The letter states: “Lil brother tell me what you think about that. That’s why I’m asking you to please take care of things for me when you get out and please don’t forget because I really need this out of my way.” Saul exhorts Wayne not to show the letter to anyone. The letter concludes with a reminder that Wayne promised to take care of the matter three days after he gets “out”, presumably of prison. In letter S-33, Saul again asks about the matter: “Wayne you see I go to court soon and you know I have to get that persons out of my way and the only way I can do that is by you taking care of things for your boy.” He continues by noting that Wayne has her address, telephone number, and work address. He states that he hopes Wayne is not playing a game with him and implores him to do as he promised. Exhibits S-32 *83 and S-33 were admitted, but for the record only.
Exhibit S-30 is a love note which Geraldine Nunn testified she saw Saul Johnson place on Earline Nunn’s door on the Monday prior to the murder. Exhibit S-31 was another love letter placed under Earline’s door, signed by Saul. A handwriting expert compared the note, the love letter, and the letter given by Saul to Williams with the photocopy of the “Raymond” letter, as well as two other letters (S-32 and S-33) written to another inmate. The expert testified that S-32 and S-33 were written by the same person who wrote the love note and letter as well as the letter given to Williams. The expert also testified that it was “highly likely” that the “Raymond” letter was also written by the same person, but he could not be absolutely sure because he was dealing with only a photocopy of the “Raymond” letter.
On May 31, 1989 a jury convicted the defendant of second degree murder in violation of LSA-R.S. 14:30.1 for which he received a sentence of life imprisonment without benefit of parole, probation or suspension of sentence on June 21, 1989.
On appeal Saul Johnson contends that the trial court erred in: (1) denying his request for new counsel, and (2) giving an improper jury instruction on reasonable doubt.
Defendant argues that he was denied his right to effective counsel free from conflict because he and inmate Henry Foster, a prosecution witness, were both represented by the Orleans Indigent Defender Program (OIDP). Actual conflict of interest so as to preclude effective assistance of counsel is established when defendant shows that the attorney was placed in a situation inherently conducive to divided loyalties. State v. Carmouche, 508 So.2d 792 (La.1987); State v. Serpas, 485 So.2d 999 (La.App. 4th Cir.1986). Rule 1.10 of the Rules of Professional Conduct prohibits representation by a law firm of clients with conflicting interests. Louisiana R.S. 15:145(2) provides that in the event of conflicts of interest, the indigent defender board may request that the court appoint counsel to represent the indigent defender. In State v. McNeal, 594 So.2d 876 (La. 1992), the Louisiana Supreme Court granted the defense attorney’s right to withdraw because another OIDP attorney represented a witness against the defendant. In the present case, an OIDP attorney represented Henry Foster when he testified at the first trial, and his testimony, including the prior cross-examination, was read into the record because Foster was unavailable. Foster was a fellow inmate to whom Saul Johnson admitted that he had committed the murder. In Arizona v. Fulminante, — U.S. -, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991), the United States Supreme Court held that the admission of involuntary statements or confessions are subject to harmless error analysis. In that case, defendant, Fulminante, admitted to murdering the victim and provided details of the crime to a fellow inmate who was a paid informant for the Federal Bureau of Investigation. That confession was found to be coerced because Fulminante was motivated to confess by fear of physical violence absent protection from his fellow inmate. The United States Supreme Court stated: “When reviewing the erroneous admission of an involuntary confession, the appellate court, as it does with other forms of improperly admitted evidence, simply reviews the remainder of the evidence against the defendant to determine whether the admission of the confession was harmless beyond a reasonable doubt.” Fulminante, supra, — U.S. at -, 111 S.Ct. at 1265. The State has the burden to show that the trial error did not contribute to the defendant’s conviction. Chapman v. State of Cal., 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); State v. Wille, 559 So.2d 1321 (La.1990).
A harmless error analysis applies to the admissibility of Foster’s testimony. The record shows that the defendant announced prior to the killings that he was going to kill Earline Nunn. After the fact he told his sister-in-law that he killed the victim. Earline Nunn’s ring was found under the back seat of the defendant’s car. She was killed with a .38 caliber weapon, a type *84 which Saul Johnson was known to possess. After he was arrested, Saul Johnson admitted to John Williams, another inmate, that he had killed Earline Nunn. The defendant also tried to enlist the aid of various people through letters he sent while in prison to create a suspect for the murders, to shift the blame for the murders onto his wife and/or his brother, and to have his wife (a possible witness against him) killed. The defendant’s wife identified Saul Johnson’s handwriting, and the handwriting expert concluded he had written the letters. In addition, at trial defendant’s sister-in-law related that Saul Johnson told her to ignore her subpoena and to risk sixty to ninety days imprisonment because he could “get out” if she did not testify. Clearly the trial error of admitting Foster’s testimony did not contribute to the defendant’s conviction under the totality of the evidence provided by the State. Any error was harmless.
The defendant also contends that the trial court erred in its definition of reasonable doubt included in its jury instructions and that he was so prejudiced that his conviction should be reversed. At trial defendant objected to the reasonable doubt jury instruction in this case which is essentially the same as that found to be improper in Cage v. Louisiana, — U.S. -, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990). As a trial error, the jury instruction is subject to a harmless error analysis. State v. Cage, 583 So.2d 1125 (La.1991). Considering the entire record in light of the overwhelming evidence establishing defendant’s guilt, the State established that there was no reasonable possibility that the instructional error contributed to the guilty verdict. The erroneous jury charge constitutes harmless error.
Accordingly, the judgment of the trial court is affirmed.
AFFIRMED.