673 So.2d 1103 (1996)
STATE of Louisiana
v.
Joel DURHAM.
No. 94-KA-1036.
Court of Appeal of Louisiana, Fifth Circuit.
April 16, 1996.
*1107 Bruce G. Whittaker, Staff Appellate Counsel, 24th Judicial District, Indigent Defender Board, Gretna, for Appellant Joel Durham.
John M. Mamoulides, District Attorney, Alison Wallis, Assistant District Attorney, 24th Judicial District Parish of Jefferson, Gretna, for Appellee State of Louisiana.
Before GAUDIN, CANNELLA, JJ., and Remy CHIASSON, J. Pro Tem.
CANNELLA, Judge.
Defendant, Joel Durham, appeals from his conviction of first degree murder and his sentence to life imprisonment at hard labor without benefit of parole, probation or suspension of sentence. For the reasons which follow, we affirm.
Deputy Mark Cerabolo testified that on February 8, 1992 he responded to a call at a McDonald's restaurant on Severn Avenue in Metairie, Louisiana. He found a young man, Leo Kern, lying unconscious on the floor, receiving cardiopulmonary resuscitation (CPR) from a deputy and a civilian. Kern had been shot. Additional officers and emergency personnel arrived shortly thereafter and the victim was driven away and died from the gunshot wound. Cerabolo secured the scene and found a spent projectile, which had pierced the victim's body and lodged in the ceiling of the restaurant. Officers also recovered a casing from a nine millimeter pistol. There were several witnesses to the crime who saw the perpetrator. Captain Walter Gorman, at the scene, obtained descriptions of the perpetrator from these eyewitnesses. Two of them, a McDonald's employee, Antoinette Dickerson, and the victim's fiancee, Yesenia Aniles, saw the perpetrator point a gun at Kern, receive *1108 money from him and then shoot him. Gorman made several composite sketches of the perpetrator and the witnesses agreed on one that best depicted his appearance. This drawing was used in the sheriff's office "wanted" bulletins.
The following night, Detective Gregory Noble was on duty and saw the composite drawing of the murder suspect and recognized the perpetrator as Joel Durham. He so informed Lieutenant Steve Buras, commander of the sheriff's office homicide division. Based on this information, Buras compiled a photographic lineup which included a picture of defendant and showed it to the witnesses. The five witnesses who viewed the photographic line-up all selected the picture of defendant as the person who had shot Kern.
Meanwhile, on the night following the shooting, Lester Ibesa, upon seeing the news account of the shooting and the picture of defendant, went to his family and told them that he had been involved in the robbery and shooting at the McDonalds. Two days after the shooting, on the morning of February 10, 1992, at 5:00 a.m., Ibesa, accompanied by his mother and stepfather, turned himself in at the First District lockup on Metairie Road. He gave a statement to the deputies informing them of his involvement in the crime as well as the involvement of defendant. He told the officers that defendant was staying at his parents' house in Tylertown, Mississippi. Ibesa also took Buras to the home of a friend on West Loyola Drive in Kenner where the weapon used in the robbery and shooting was located.
Based on the evidence that they had gathered, the officers obtained an arrest warrant for defendant. Several Jefferson Parish officers went to Tylertown, Mississippi to arrest defendant. Accompanied by local authorities, they went to the address supplied by Ibesa and found defendant there in bed, asleep. They placed him under arrest and he transported him to the Walthall Sheriff's Department, in Mississippi. He was advised of his rights. Defendant agreed to waive his rights and make a statement. In that statement, he denied having been in the McDonalds in Metairie on the night of the shooting. Some hours later, defendant made a second statement in which he admitted that he robbed Kern, but he stated that the gun fired accidentally. Defendant signed a waiver of extradition and voluntarily returned to Louisiana with the Jefferson Parish officers.
On April 9, 1992, defendant and Ibesa were indicted for the first degree murder of Kern, in violation of La.R.S. 14:30. Defendant was arraigned on April 27, 1992 and entered a plea of not guilty. On July 1, 1992, the trial court granted Ibesa's motion to sever. On September 11, 1992 the trial court heard and denied defendant's motion to suppress his confession. On October 16, 1992 the trial court heard and denied defendant's motion to suppress the identifications. Trial commenced against defendant, alone, on March 21, 1994 and continued over a five day period.
The state's chief witness against defendant was Ibesa. He testified at trial that he had been acquainted with defendant for about a month before the shooting, that he had purchased the gun which was used in the shooting, that he had fired it several times and that defendant had also fired it before the shooting. On the night of the robbery and shooting, Ibesa was in the company of defendant in the early evening and they had been drinking and taking Xanax pills. Defendant told Ibesa that he needed money for rent. Ibesa suggested that he rob the Eggroll House Restaurant, where he had previously worked. The two drove to the restaurant in defendant's car. Defendant took Ibesa's loaded nine millimeter semi-automatic pistol with him. They did not carry out the robbery because the restaurant was closed. Defendant then drove the car to a Time Saver store with the intent of robbing it, but decided against it because the store was too well lighted. Defendant next drove to a Shell service station, but decided against robbing it because of the bullet proof glass. At about 9:30 p.m., the two men drove to the McDonalds restaurant on the corner of Severn and West Esplanade Avenues. Defendant parked his car on the West Esplanade Avenue side and told Ibesa to go inside and check it out as a possible target. Ibesa went into the restaurant and walked toward the *1109 bathrooms. He observed several patrons and employees. He returned to the vehicle and told defendant that he could not successfully rob the restaurant. However, defendant insisted, stating, "I can do this place." Defendant told Ibesa to drive around to the other side of the restaurant. Ibesa drove around to the other side and observed defendant through the window. He stated that he saw defendant pull the gun out and point it at Kern. Kern put a black box on the counter and gave money to defendant. Defendant then fired the gun, hitting Kern. Defendant ran out of the restaurant door. As defendant ran across the parking lot toward the car, he encountered another McDonalds' employee, Lawrence Landry, who had fled the restaurant through a rear door after hearing the gunshot. Defendant looked directly at Landry and pointed the gun at him, but did not shoot. Defendant entered the passenger side of the vehicle and told Ibesa to drive off. As he entered the vehicle, Ibesa testified that defendant said to him "I should have shot the (racial epithet)," referring to Landry. Defendant had the money in his left hand and the gun in his right hand. Defendant handed Ibesa twenty of the sixty dollars he had taken from the restaurant. Ibesa testified that defendant told him that he shot Kern because Kern had said that he was going to remember his face.
Several other witnesses to the shooting identified defendant and Ibesa. One witness described defendant's actions as "very deliberate and very normal." Another witness testified that Kern gave defendant the money and said to the defendant, "Don't shoot, don't shoot" and the defendant fired. Still another witness testified that the gun was pointed at Kern's heart and that defendant appeared to be aiming the gun.
Louise Walzer, a firearms expert, testified that she compared the projectile from the ceiling, the casing, the firearm and found that they all matched. She also testified that the muzzle of the weapon was between eighteen and twenty-four inches from the victim when it was fired. She stated that she tested the weapon for accidental firing and that it would not fire accidentally.
Dr. Susan Garcia performed the autopsy on Kern. She testified that the victim died from a single gunshot to the left chest. The bullet exited the lower back. The angle of the wound indicated that either the gun was above the victim or that the victim was leaning slightly forward when he was shot. The bullet struck the pulmonary artery and the victim bled to death. Dr. Garcia opined that the weapon was twelve to eighteen inches from the victim when it was fired.
Defendant did not testify at trial. The trial concluded on March 26, 1994 with a unanimous jury verdict of guilty, as charged, of first degree murder. The penalty phase of the proceedings was conducted on March 28 and 29, 1994 and concluded with a unanimous recommendation of life imprisonment. On April 27, 1994 defendant was sentenced to life imprisonment at hard labor without benefit of parole, probation or suspension of sentence. Defendant filed a motion for new trial and a motion to reconsider sentence. Both motions were denied. Defendant filed a motion for appeal which was granted.
On appeal defendant assigns eight errors.

ASSIGNMENT OF ERROR NUMBER ONE
Defendant argues that his constitutional rights were violated at trial when the state used its peremptory challenges to systematically exclude black prospective jurors from the panel, contrary to Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). The basis of defendant's Batson challenge is that the prosecution used three of its peremptory challenges in challenging Ms. Comeaux, Ms. Townsend and Ms. Davis, to purge the jury of all remaining black members. The defendant, noting that the jury finally selected was composed of only white jurors, alleged that the state had intentionally struck the black prospective jurors based solely upon their race, perhaps fearing that these jurors would be more sympathetic to the defendant. The defendant argues that this is exactly the sort of practice forbidden by the Supreme Court in Batson, supra.
In response to defendant's challenge during trial, the trial court disagreed with the defense and felt that insufficient evidence of discrimination had been shown. Nevertheless, *1110 the state insisted on putting into the record "race-neutral" reasons for the exercise of its peremptory challenges. The trial judge found that the state explanations were acceptable "race-neutral" reasons for striking the black prospective jurors, i.e., that the exercise of the peremptory strikes by the state was not racially motivated and, accordingly, overruled defendant's objections. The state insists in brief that its peremptory challenges of the black prospective jurors were not racially motivated and that defendant's argument lacks merit.
In Batson the Supreme Court adopted a three-step analysis to determine whether the constitutional rights of prospective jurors have been infringed by impermissible discriminatory practices:
First, the defendant must make a prima facie showing that the state has exercised peremptory challenges on the basis of race. Second, if the requisite showing has been made, the burden shifts to the state to articulate a race-neutral explanation for striking the jurors in question. Finally, the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination.
Hernandez v. New York, 500 U.S. 352, 358-359, 111 S.Ct. 1859, 1866, 114 L.Ed.2d 395 (1991) (citations omitted).[1] For a Batson challenge to succeed, it is not enough that a racially discriminatory result be evidenced. Rather, that result "must ultimately be traced to a racially discriminatory purpose." Batson, supra, 476 U.S. at 94, 106 S.Ct. at 1721, quoting Washington v. Davis, 426 U.S. 229, 240, 96 S.Ct. 2040, 2048, 48 L.Ed.2d 597 (1976). Thus, the sole focus of the Batson inquiry is upon the intent of the state at the time the peremptory strikes were exercised. In Powers v. Ohio, 499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991) and Holland v. Illinois, 493 U.S. 474, 110 S.Ct. 803, 107 L.Ed.2d 905 (1990) the Supreme Court stressed that its holding in Batson does not require the defendant to show that he is a member of the same cognizable racial group as the one whose members have been excluded from the jury. The Holland court stated, "[t]o the contrary, our cases hold that the Sixth Amendment entitles every defendant to object to a venire that is not designed to represent a fair cross section of the community, whether or not the systematically excluded groups or groups to which he himself belongs." 493 U.S. at 477, 110 S.Ct. at 805.
The first step in this process places a burden of production on the defendant. If the defendant is unable to make out a prima facie case of racial discrimination, then the Batson challenge fails and it is not necessary for the prosecutor to articulate "race-neutral" explanations for his strikes. The defendant may offer any facts relevant to the question of the state's discriminatory intent to satisfy this burden. Such facts include, but are not limited to, a pattern of strikes by the state against members of a suspect class, statements or actions of the state which support an inference that the exercise of peremptory strikes was motivated by impermissible considerations, the composition of the venire and of the jury finally empaneled, and any other disparate impact *1111 upon the suspect class which is alleged to be the victim of purposeful discrimination. State v. Green, 94-0887 (La.5/22/95), 655 So.2d 272. See State v. Collier, 553 So.2d 815 (La.1989); State v. Thompson, 516 So.2d 349 (La.1987), cert. denied, 488 U.S. 871, 109 S.Ct. 180, 102 L.Ed.2d 149 (1988), rehearing denied, 488 U.S. 976, 109 S.Ct. 517, 102 L.Ed.2d 551 (1988).
Regarding this first step of the Batson analysis, the defense argued to the trial court that the state had used a disproportionate percentage of its strikes against black prospective jurors and, as a result, all black prospective jurors had been eliminated. The trial court was initially of the view that the defense had not met its burden of establishing a prima facie showing that the state had exercised peremptory challenges on the basis of race. The state, nevertheless, articulated for the record explanations for striking the jurors in question. "Once a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot." Hernandez, supra, 500 U.S. at 359, 111 S.Ct. at 1866.
Moving on to step two, we must consider the "race-neutral" explanation offered by the state for the exercise of the peremptory challenges in question. At this point, the burden of production or going forward shifts to the state, who must offer a "race-neutral" explanation for its exercise of peremptory strikes. Given the nature of the Batson challenge in this case, the state was obligated to come forward with a "race-neutral" explanation for challenging black jurors. The burden upon the state at this juncture is to articulate reasons for the challenges that are unrelated to race or other suspect classifications; "[t]he second step of this process does not demand an explanation that is persuasive, or even plausible." Purkett v. Elem, ___ U.S. ___, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995). Such an explanation, while it "need not rise to the level justifying exercise of a challenge for cause," must do more than merely affirm the state's "good faith in making individual selections." Id, 476 U.S. at 98, 106 S.Ct. at 1723-1724.
Essentially, the burden on the state at this stage is to articulate reasons unrelated to impermissible classifications, such as race, for striking certain prospective jurors. It must be remembered that in this, the second stage of the Batson analysis, "the issue is the facial validity of the state's explanation;... [u]nless discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." Hernandez, supra, 500 U.S. at 360, 111 S.Ct. at 1866.
The state gave specific reasons for striking the jurors in question. The prosecutor stated that he used one peremptory challenge against Comeaux because "she complained about her back and she said she couldn't sit ... and I'm afraid that she's going to get to Jefferson Parish and she's going to get worse."[2] He stated that he used a peremptory challenge to eliminate Townsend because he "found her responses concerning the death penalty were extremely weak. I so noted those on my jury selection sheet and also, there was zero eye contact between this lady and myself during the course of the time that I was questioning her." Finally, as to Davis, the state offered the following:
First off, I think in this case the Court can take judicial notice that Joel Durham is white. Secondly, at least several of the State witnesses are going to be black. One of the people who was almost shot in this case is black. We would love to have a black juror. However, Ms. Davis did make a statement about her brother being a narcotics addict. With the narcotic issue being raised by the defense, we feel at this time that she is not a good juror to sit on this case as far as the state is concerned. Also, no other prospective jurors claimed to have anybody in their families to be *1112 addicted to drugs or they would also be struck.
The reasons given by the state for exercising the peremptory challenges are facially "race-neutral." They contain none of the cultural, geographic, or linguistic classifications which, due to the ease with which such classifications may serve as a proxy for an impermissible classification, invite particularly exacting scrutiny. Compare Hernandez, supra, 500 U.S. at 357, 111 S.Ct. at 1868 (state's striking of Spanish-speaking jurors "raised a plausible, though not a necessary, inference that language might be a pretext for what in fact were race-based peremptory challenges"). In short, we conclude that none of the reasons articulated by the state are readily associated with the suspect class which is alleged to be the object of the state's discriminatory use of peremptory strikes, i.e. prospective black jurors.
For these reasons, we find that the state sustained its burden of articulating "race-neutral" reasons for the exercise of its peremptory strikes. Whether these reasons are substantial and, more importantly, whether they are substantiated by the record, is a question to be determined in the third stage of the Batson analysis.
Once the state has satisfied the second stage of the Batson procedure, "[t]he trial court ... then [has] the duty to determine if the defendant has established purposeful discrimination." Batson, supra, 476 U.S. at 98, 106 S.Ct. at 1724. In reaching a decision, the trial court should examine all of the evidence available. Essentially, this involves a comparison of the arguments and facts in support thereof posited in defendant's prima facie offering with the "race-neutral" reasons articulated by the state to determine whether the state engaged in purposeful discrimination. This comparison must be made in light of the record. Reviewing courts owe the trial judge proper deference in assessing the credibility of in-court testimony.
Thus, the proper inquiry in the final stage of the Batson analysis is not whether the state has disproved the existence of purposeful discrimination suggested by defendant's prima facie case. Rather, the question is whether defendant's proof, when weighed against the state's proffered "race-neutral" reasons, is strong enough to persuade the trier-of-fact that such discriminatory intent is present. State v. Green, supra.
The trial court found no discriminatory intent in the state's exercise of its peremptory challenges. To the contrary, he stated, "I regard the peremptory challenges and strikes for both cause and peremptory made by both sides, by both the state and the defense, as nothing more than an appropriate exercise of strategy during a trial by competent adversaries."
The determination, as to whether the defense has proven discriminatory intent by the state in the face of the state's "race-neutral" explanations for its actions, is largely a factual one made by the trial judge with the benefit of hearing the voir dire questions, answers and seeing the prospective jurors reactions during the questioning. Accordingly, the trial court's determination on a Batson claim is entitled to great deference on appellate review, and will not be disturbed unless the record indicates that any reasonable trial court must reach the conclusion that the state exercised peremptory challenges on the basis of a juror's race alone. State v. Hamilton, 594 So.2d 1376 (La.App. 2nd Cir.1992); State v. Lamark, 584 So.2d 686 (La.App. 1st Cir.1991), writ denied, 586 So.2d 566 (La.1991).
All of the race-neutral explanations proffered by the state in this case are well supported. The health and stamina of a juror has been accepted as a "race-neutral" explanation for challenging a minority juror. State v. Swafford, 588 So.2d 1276 (La.App. 2nd Cir.1991). Likewise, objection to a prospective juror's weak responses on the death penalty has been held to be a "race-neutral" explanation, State v. Green, supra, as has objection to a prospective juror because he or she has relatives who were drug addicts. State v. King, 604 So.2d 661 (La.App. 1st Cir.1992).
Defendant's proof of discriminatory intent, to contradict the state's "race-neutral" explanations, is two-fold. First, he points out that *1113 of the initial eleven black prospective jurors, eight were dismissed for cause and three with peremptory challenges, with the effect that all black prospective jurors were excluded from the jury. Second, defendant argues that other white prospective jurors gave answers to state questions which were similar to the answers given by the challenged black jurors and the white prospective jurors were not challenged by the state.
The mere fact that all black prospective jurors were excused from the jury pool while providing support for defendant's prima facie case of state discriminatory intent, does not alone suffice to establish discriminatory intent by the state in the face of "race-neutral" explanations. State v. Green, supra. In this case, eight of the prospective jurors excused were excused for cause by the trial judge. Their removal from the jury pool cannot be attributed to the state's discriminatory intent. Further, the final composition of the jury will not alone suffice to prove the state's discriminatory intent in the exercise of its challenges.
However, evidence that the state did not pursue any consistent, trial-related strategy of striking jurors of all races with the same or similar characteristics as those expressed in the "race-neutral" explanation for the exercise of the strikes is a strong factor in showing discriminatory intent. State v. Collier, 553 So.2d 815 (La.1989). Nevertheless, the mere fact that the state excuses one person with a particular characteristic and not another similarly situated person does not in itself show that the state's explanation was a mere pretext for discrimination. The accepted juror may have exhibited traits which the state could have reasonably believed would make him desirable as a juror. State v. Collier, supra.
In this case, after reviewing the record, the defense evidence and the state's response, as well as the trial judge's ruling and reasons, we find that defendant has failed to meet his burden of proving discriminatory intent on the part of the state to exclude black jurors in the exercise of its peremptory challenges. Three black prospective jurors were excused by state peremptory challenge, which resulted in an all white jury. The state offered legitimate "race-neutral" explanations for the exercise of these peremptory challenges. Comeaux was challenged because she had physical ailments which would have made her service difficult and may have perhaps distracted her from her duties as a juror. The state challenged Townsend because of her weak death penalty responses and her lack of eye contact. While the defense points to other jurors who hesitated in their death penalty responses, none reached the level of Townsend's. That, coupled with her lack of eye contact, supports the state's assertion that there was no discriminatory intent in exercising a peremptory challenge against her. Davis was challenged because she had a brother who was a drug addict and the case involves drug-related issues. At the time Ms. Davis was struck, no other prospective juror had disclosed that they had a relative who was a drug addict. Although Girovard did disclose that she too had a brother who was a drug addict and the state did not move to strike her on that ground, the state did thereafter use the last peremptory challenge to strike Lear who disclosed that she had been married to an alcoholic for sixteen years. Therefore, based on the totality of the record, and with deference to the trial judge in his credibility determination, we find that defendant has not established a Batson violation requiring reversal of his conviction.

ASSIGNMENT OF ERROR NUMBER TWO
Defendant argues that the trial court erred in refusing his challenge for cause of prospective juror, Douglas Dyer. More particularly, defendant argues that his challenge of this prospective juror should have been granted, since his responses showed that he refused to accept the law as given to him by the trial court. The defense is referring to the following exchange which took place during voir dire:
Q: And in terms of circumstances, would you take into account, or do you think you should take into account the fact that someone is young, let's say 18 and not 25 or 35?

*1114 A: Not particularly. No.
Q: If the law says: Hey, you've got to take that into consideration* * * Thank you judge. And believe me, all of this legal stuff will be taken care ofthat is what Judge Allen is here for
A. Well something to clear my mind, if the Defendant is being tried as an adult, then adult is a very large category and he should be punished as an adult.
Q: And it wouldn't make any difference to you whether he was 18 or 28 or 38 or 60.
A. No. He is in the adult category.
Defendant argues that this shows the prospective juror's refusal to follow the law as given, in that he refused to consider age as a mitigating factor in the penalty phase of the proceedings.
The state argues that this exchange between Dyer and defense counsel does not establish a refusal on the part of Dyer to follow the law as given by the judge. Rather, the state points out that Dyer's comments were only directed to the fact that defendant was being tried as an adult rather than as a juvenile.
La.C.Cr.P. art. 797, addressing challenges for cause, provides in pertinent part:
The state or defendant may challenge a juror for cause on the ground that:
(2) The juror is not impartial, whatever the cause of his partiality. An opinion or impression as to the guilt or innocence of the defendant shall not of itself be sufficient ground of challenge to a juror, if he declares, and the court is satisfied, that he can render an impartial verdict according to the law and the evidence;
(4) The juror will not accept the law as given to him by the court;
"Prejudice is presumed when a challenge for cause is erroneously denied and all of defendant's peremptory challenges are exhausted. A trial court's erroneous ruling which deprives the defendant of a peremptory challenge substantially violates that defendant's rights." State v. Ross, 623 So.2d 643, 644 (La.1993). To prove that there has been reversible error, defendant need only show that there was an erroneous denial of a challenge for cause and that he used all of his peremptory challenges.[3]State v. Ross, supra; State v. Robertson, 92-2660 (La.1/14/94), 630 So.2d 1278.
However, the trial judge is vested with broad discretion in ruling on challenges for cause. His rulings will be reversed only when a review of the entire voir dire reveals his exercise of discretion was arbitrary and unreasonable with resultant prejudice to defendant. State v. Knighton, 436 So.2d 1141, 1148 (La.1983), cert. denied, Knighton v. Louisiana, 465 U.S. 1051, 104 S.Ct. 1330, 79 L.Ed.2d 725 (1984). State v. Jonathan Hawkins, 90-1235 (La.App. 4 Cir. 9/15/95), 667 So.2d 1070.
Applying these precepts to the circumstances presented here, we find that the action of the trial court, denying defense counsel's challenge for cause of Dyer, was neither arbitrary nor unreasonable. Dyer's answers never revealed bias or an inability or refusal to follow the law given him by the trial court. He was vaguely questioned about his feelings concerning the age of a defendant. But the questioning dealt more with whether the prospective juror considered defendant a juvenile or an adult. The questioning fell far short of Dyer stating that he could not or would not consider age as a mitigating factor in the death penalty phase of the trial if instructed to do so by the trial court. Therefore, we find no abuse of the trial court's discretion in this ruling.
Moreover, defendant has not shown any prejudice suffered by Dyer serving on the jury. At the conclusion of the penalty phase of the trial, the jurors returned the unanimous recommendation that defendant be sentenced *1115 to life in prison, instead of death. Accordingly, we find that this assignment of error lacks merit.

ASSIGNMENT OF ERROR NUMBER THREE
Defendant argues that the trial court erred in dismissing four prospective jurors for cause based on their responses about their ability to recommend the death penalty, contrary to Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). Defendant is referring to prospective jurors Melancon, David, Touchet and Judice. He argues that the four jurors were equivocal and not definite in their inability to recommend a death sentence and, accordingly, the trial court erred in dismissing them for cause.
The state argues, to the contrary, that all four of these jurors were very specific in expressing their inability to recommend a death sentence and, thus, were properly dismissed for cause.
In Witherspoon v. Illinois, supra, the United States Supreme Court held that, where a jury is chosen by excluding jurors for cause because they voice general objections to the death penalty or express conscientious or religious scruples against its imposition, a death sentence recommended by them cannot be constitutionally carried out. An exclusion of jurors for cause is only proper under Witherspoon if the jurors make it clear that they will automatically vote against the death penalty regardless of the evidence, or that their attitudes toward the death penalty would make it impossible for them to render an impartial decision as to the defendant's guilt. State v. Celestine, 443 So.2d 1091 (La.1983), cert. denied, 469 U.S. 873, 105 S.Ct. 224, 83 L.Ed.2d 154 (1984); State v. Butler, 462 So.2d 1280, 1282-1283 (La.App. 5 Cir.1985), writ denied, 541 So.2d 886 (La. 1989).
The Supreme Court clarified the Witherspoon standard in Wainwright v. Witt, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985). The appropriate standard for determining when a prospective juror may be excused for cause because of his views on capital punishment is now "whether the juror's views would `prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" Witt, 469 U.S. at 424, 105 S.Ct. at 852. (quoting from Adams v. Texas, 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980)). See also, State v. Lindsey, 543 So.2d 886 (La.1989), cert. denied, 494 U.S. 1074, 110 S.Ct. 1796, 108 L.Ed.2d 798 (1990); State v. Tassin, 536 So.2d 402 (La.1988), cert. denied, 493 U.S. 874, 110 S.Ct. 205, 107 L.Ed.2d 159 (1989).[4] The Witt court further noted that deference must be paid to the trial judge who sees and hears the juror because the trial judge may be left with an impression "that a prospective juror would be unable to faithfully and impartially apply the law" even though such an impression is not evidenced in the printed record. Witt, 469 U.S. at 425-426, 105 S.Ct. at 852-853.
In the instant case, the defense cites portions of each prospective jurors' questioning, in which the juror exhibited equivocation or uncertainty about his or her ability to recommend the death penalty. However, other portions of the transcript evidence deliberate responses by each of these prospective jurors that they could not recommend the death penalty under any circumstances.
Prospective juror Melancon was asked by defense counsel whether she could "try to follow the law", and "listen to both sides *1116 fairly." She responded, "I can do that, but I'm still against the death penalty." The court then asked Melancon, "Do you feel like you could consider imposing the death penalty if you think that he is guilty of the crime he is charged with?" She answered, "No." Thus, Melancon made it clear that she could not vote for the death penalty under any circumstances.
Prospective juror David initially stated that he believed in capital punishment. Thereafter, however, David said that it would "be hard for me to do it." When the state asked whether this was a "personal feeling, religious or moral belief," David responded, "Yeah, I don't think I could do it." After further questioning, David stated, "I don't think I could put anybody to death." The state asked if there was anything that could change his mind, and David responded, "No, I don't think so." Finally, when asked by the trial judge whether he could recommend the death penalty depending on the circumstances of the crime, David answered that he could not.
When Judice was asked whether he could impose the death penalty, he responded, "No." The state asked him whether his feelings against the death penalty were long-standing, and Judice responded, "Yes, sort of, but it's not justI had them long before today." Judice stated that he would automatically choose life imprisonment and could never choose the death penalty. On further questioning by defense counsel, Judice said that he could consider the death penalty under certain circumstances. However, when questioned again by the state, Judice answered that he truly could not envision any circumstances under which he could impose the death penalty.
Touchet, saying that he could not impose the death penalty based on his personal beliefs, stated unequivocally, "I don't believe in death at all." He could not impose the death penalty no matter what the evidence was.
Accordingly, considering the record, as well as the deference to be paid the trial court, it is clear from our review of the record that the trial court followed the dictates of La.C.Cr.P. art. 798 and the federal standards of Witherspoon and Witt in excusing these jurors for cause and that there was no error in the trial court's action excusing them.
Moreover, the Louisiana Supreme Court has consistently held, under the Witherspoon standard, that where the jury did not recommend the death penalty, defendant is insulated from the death penalty, and there is, therefore, no valid Witherspoon complaint. State v. Edwards, 406 So.2d 1331 (La.1981), cert. denied, 456 U.S. 945, 102 S.Ct. 2011, 72 L.Ed.2d 467 (1982); State v. Whitt, 404 So.2d 254 (La.1981); State v. George, 371 So.2d 762 (La.1979), cert. denied, 444 U.S. 953, 100 S.Ct. 430, 62 L.Ed.2d 325 (1979). Defendant did not receive a death sentence in this case. Thus, he has no valid complaint regarding the impartiality of the jury in the imposition of sentence. This assignment lacks merit.

ASSIGNMENT OF ERROR NUMBER FOUR
Defendant argues that the trial court erred in allowing the state to present evidence of an inculpatory statement allegedly made by defendant without first giving the defense notice of its intent to use the statement. The defense argues that they were unfairly prejudiced by use of this surprise testimony, introduced in violation of the rules of criminal procedure requiring prior notice to defendant. La.C.Cr.P. art. 716(B).
More particularly, during trial Ibesa stated that when defendant left the McDonald's after shooting Kern, he came upon a black cook who had exited the back of the restaurant. Defendant pointed the gun at the cook but did not fire. Ibesa testified that defendant then got into the car and said "I should have shot the (racial epithet)." The defense objected to the use of this statement.
The state argues that, because the statement was a res gestae statement, they are not required to give defendant notice of their intent to use such a statement.
*1117 The criminal discovery article pertaining to statements by defendant, La. C.Cr.P. art. 716, provides in pertinent part:
B. Upon motion of the defendant, the court shall order the district attorney to inform the defendant of the existence, but not the contents, of any oral confession or statement of any nature, made by the defendant, which the district attorney intends to offer in evidence at the trial, with the information as to when, where and to whom such oral confession or statement was made.
Our review of the record indicates that the defense was given notice by the state of the existence of the statement in question. In the defense "Request and Motion for Discovery" at number 74, the defense asked "Does the state intended to introduce any out-of-court statement or statements that form part of the res gestae of the alleged offense in question." The state responded that it intended to use statements by both defendant and Ibesa which were inculpatory. While it is true that the state did not inform the defense of the substance of the statement, there is no requirement in La.C.Cr.P. art. 716(B) that the state do so.[5]
Furthermore, statements admitted into evidence without prior discovery, under La.C.Cr.P. art. 716(B), will not constitute reversible error if harmless. State v. Grant, 517 So.2d 1151 (La.App. 5th Cir.1987). First, there is some question here whether the statement in question was inculpatory at all. To the extent that it may have been persuasive on the question of intent, that is, whether defendant intended to shoot Kern, we find its admission harmless in view of the proceedings that transpired outside of the presence of the jury and the overwhelming evidence establishing that the gun did not fire accidentally.
When the defense objected to the use of the statement in question, the trial court excused the jury and the state questioned Ibesa about the details of his testimony concerning the statement. The case then went back before the jury with defense counsel knowing what the testimony was going to be and prepared for cross examination of the witness. Additionally, other trial testimony negated defendant's accidental firing defense. Ibesa testified that defendant admitted that he shot Kern because Kern stated that he would remember his face. There was also testimony of the other witnesses that defendant's actions appeared deliberate. It was noted that defendant exhibited a total lack of any remorse. The state's weapon expert testified that the gun could not have discharged accidentally. Therefore, we find that, even if there was error in the admission of the statement into evidence without proper discovery, it was harmless. Accordingly, we find no reversible error presented by this assignment of error.

ASSIGNMENT OF ERROR NUMBER FIVE
Defendant argues that he was prejudiced by the state's interference with his right to question witnesses involved in the case. More particularly, he argues that the state interfered with his questioning of Christy Bullard, defendant's girlfriend, because the state threatened her with prosecution for perjury if she testified contrary to the testimony of Ibesa. The defense also contends that his right to question Ibesa was effected by the state forbidding Ibesa from talking to him. The state argues that there is no record support for either of these defense arguments.
The defense brief does not cite any record evidence supporting its argument concerning Bullard and our review of the record has revealed none. There was a discussion on the record of the defense allegations that the witness had been threatened by the state if she testified. The defense claimed to have a tape recording evidencing the threats. However, the result of that discussion was a court ruling that, if the witness were called by either side, an evidentiary hearing would be held prior to her testifying to allow the introduction of any evidence supporting or contradicting the defense allegations that the witness *1118 had been threatened by the state to give testimony consistent with Ibesa's testimony. The defense did not object to that ruling. Thereafter, neither side called the witness to testify, so the evidentiary hearing was never held and there was no further trial court ruling in the matter.
Therefore, there is nothing in the record to support the defense arguments on appeal that their questioning of Bullard was limited by state threats to prosecute her for perjury if she did not testify consistently with Ibesa's testimony.
Also, as part of this assignment of error, the defense argues that they were prevented from speaking with Ibesa because the state ordered him not to speak with defense counsel. However, defendant cites this court to no adverse ruling by the trial court concerning this matter. The trial court ruling that was cited refers to the denial of motion number eighty, which was a defense motion to be allowed to speak with Ibesa's attorney. In the motion, defense counsel argued that the trial court should order that the attorney-client privilege, between Ibesa and his counsel, be waived.
The record indicates that Ibesa was represented by Martin Regan. In an evidentiary hearing, Regan was called to the stand and required to testify. While it is true that Regan did assert the attorney-client privilege in response to some questions, defense counsel was given the opportunity to question Ibesa's attorney as requested. Defendant presents no argument in brief to this court that there was any error in the trial court ruling on motion eighty. Assignments of error neither briefed nor argued are considered abandoned.
In brief herein, defendant frames his argument in terms of his inability to speak with Ibesa himself. In support of this argument, the record reveals testimony by an attorney who was in court on the day Ibesa pled guilty to the lesser offense of armed robbery. She stated that, after the plea, defense counsel requested an opportunity to speak with Ibesa and the state responded that Ibesa was a state witness and that defense counsel was not allowed to speak with him. The testimony revealed that Ibesa consulted with his own attorney and then responded that he did not wish to speak with defense counsel. At trial, Ibesa did not testify that he was coerced by the state to refrain from speaking with defense counsel.
Whether a witness speaks to opposing counsel before trial is a determination to be made by the witness alone. However, the state may not deny the defense access to a witness. State v. Harris, 367 So.2d 322 (La. 1979); State v. Maize, 94-0736 (La.App. 1 Cir. 5/5/95), 655 So.2d 500, writ denied, 95-1894 (La.12/15/95), 664 So.2d 451; State v. Bray, 548 So.2d 350 (La.App. 4 Cir.1989). But cf., State v. Conger, 483 So.2d 1100 (La. App. 4 Cir.1986), writ denied, 488 So.2d 199 (La.1986), in which the court found that the defendant in a criminal prosecution does not have a right to speak to a state witness before trial.
The record evidence in this case simply does not support defendant's claim that he was denied access to Ibesa by the state. Furthermore, as stated above, defendant does not allege that there was an erroneous trial court ruling on this point. Defendant does not allege in brief what prejudice, if any, he suffered as a result of his inability to speak with Ibesa and we do not readily discern any. In fact, the record indicates that on March 24, 1994, prior to opening arguments, Ibesa was placed on the stand, outside of the presence of the jury and defense counsel was allowed to question him at that time. Therefore, because there is no trial court error complained of and no record evidence supporting defendant's claims, we find that this assignment of error has no merit.

ASSIGNMENT OF ERROR NUMBER SIX
Defendant complains that he was denied certain evidence that was favorable to his case, in violation of the constitutional mandates set out in Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). He also argues that his cross-examination of Ibesa was erroneously curtailed by the trial court.
More specifically, defendant complains that he was not advised by the state of prior bad acts that Ibesa had committed. In response to defense counsel's complaint to the court *1119 regarding the state's refusal to turn over this material, the state filed a motion in limine.
In the state's motion, it was argued that prior bad acts of a witness, which had not resulted in convictions, did not constitute Brady material which had to be turned over to the defense. The state also argued that the evidence of prior bad acts could not be used at trial.
The trial judge ordered an evidentiary hearing on the issue, setting it for the morning on which trial testimony was to begin. The only request regarding the timing of the evidentiary hearing by defense counsel was that it be conducted before opening statements. Accordingly, the hearing was conducted before opening statements.
At the hearing, Ibesa was called to the stand and defense counsel was given the opportunity to question him at length regarding his prior bad acts as well as about other issues, like his plea agreement. At the conclusion of the hearing, after defense counsel had obtained all information available concerning Ibesa's prior bad acts, the trial court ruled, denying the state's motion in limine, thus permitting defense counsel to question Ibesa about these bad acts before the jury. At this juncture, defense counsel made no further objection, such as the untimely disclosure of the bad acts. Defense counsel, in the presence of the jury, used the information ably in cross examining Ibesa concerning these acts. Accordingly, we find no reversible trial court error in this assignment of error.
Additionally, as a part of this assignment of error, defense counsel argues that the trial court erroneously curtailed his cross examination of Ibesa at trial. More particularly, defense counsel was questioning Ibesa concerning his decision to switch from appointed counsel to hired counsel and how this decision may have helped him secure a more beneficial plea arrangement with the state. Defense counsel questioned Ibesa about who his retained counsel was, and then asked him whether an associate at that firm was related to a state Supreme Court Justice. The state objected to this questioning, as absolutely irrelevant, and the trial court correctly sustained the objection.
The trial court is afforded wide discretion in limiting repetitive, harassing and irrelevant questioning on cross-examination. State ex rel. Nicholas v. State, 520 So.2d 377 (La.1988). We find no evidence here that the trial judge abused that discretion in sustaining the state's objection to a clearly irrelevant question.[6] Accordingly, we find that this assignment of error lacks merit.

ASSIGNMENT OF ERROR NUMBER SEVEN
By this assignment of error defendant argues that he was prejudiced by remarks made by the state in closing argument. More particularly, defendant contends that the state acted improperly in his rebuttal argument by calling defense counsel a liar. Defendant also argues that the state committed reversible error by making reference in his argument to the fact that defendant did not testify.
The state contends that it did not refer to defense counsel as a liar. To the contrary, in rebuttal argument, the state commented that "it was a falsehood when Mr. Smith told you that," referring to a comment by defense counsel to the jury concerning the state's burden of proving motive. The state also argues that it did not refer to the fact that defendant did not take the stand, but was making a proper argument concerning the absence of any evidence in certain areas.
In our review of the record as well as the appellate briefs, we find no support for defendant's position. The record evidence is as described by the state. The state did not call defense counsel a liar, but merely stated that earlier information defense counsel gave the jury concerning the state's burden to prove motive was a "falsehood." Defense *1120 counsel objected, indicating that he felt that the state was calling him a liar. The trial court instructed the state to not make such remarks. No further objection, motion for admonition or motion for mistrial followed the trial court's ruling. Absent further objection, there is nothing for this court to review on appeal. The court acted favorably on defense counsel's objection, as requested by defense counsel.
Moreover, every prejudicial remark made by the state in closing argument will not mandate a reversal of defendant's conviction. In order to warrant such a result, the reviewing court must be convinced that the challenged remark was so inflammatory or prejudicial that it influenced the jury and contributed to the conviction. State v. Moore, 432 So.2d 209 (La.1983), cert. denied, 464 U.S. 986, 104 S.Ct. 435, 78 L.Ed.2d 367 (1983); State v. Soler, 93-1042 (La.App. 5th Cir. 4/26/94), 636 So.2d 1069, writ denied, 94-1361 (La.11/4/94), 644 So.2d 1055.
In this case, considering the closing arguments as a whole, the remark, taken in context, was not prejudicial. But even should we consider that it was prejudicial and outside of the scope of proper closing argument, as set out in La.C.Cr.P. art. 774, there is absolutely no showing here that the remark was so inflammatory that it influenced the jury and contributed to the conviction. Therefore, we find no merit in defendant's argument that this remark by the state, to which the trial court sustained defense counsel's objection and instructed the state to not make further remarks of that nature, warrants our reversal of the conviction.
As stated above, defendant also argues in this assignment of error that the state improperly stated that defendant did not testify. It is well-settled, and in fact conceded by the state, that the state may not refer to a defendant's exercise of his constitutional right to remain silent. Griffin v. California, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965). A mistrial is mandated if the state refers directly or indirectly to defendant's failure to testify. La.C.Cr.P. art. 770. However, where the state's remarks are not a direct reference to defendant's failure to testify, the reviewing court must inquire into the remark's intended effect upon the jury, "in order to distinguish indirect references to the defendant's failure to testify (which are impermissible) from general statements that the prosecution's case is unrebutted (which are permissible)." State v. Johnson, 541 So.2d 818 (La.1989), appeal after remand, 597 So.2d 79 (La.App. 4th Cir. 1992). In cases where the state simply emphasized that its evidence was unrebutted, and there were witnesses other than defendant who could have testified on behalf of the defense but did not do so, it has been held that the state's argument did not constitute an indirect reference to defendant's failure to take the stand. State v. Johnson, supra. A mistrial is mandated only when an indirect reference is intended to draw the jury's attention to the defendant's failure to testify. State v. Smith, 433 So.2d 688 (La.1983); State v. Slay, 573 So.2d 1185 (La.App. 5th Cir.1991), writ denied, 92-3240 (La. 4/7/94), 635 So.2d 1130.
Here, there is no showing that the state made remarks that were intended as a reference to defendant's failure to testify. The only comment objected to by defense counsel at trial was made by the state in closing argument. The state was talking about its evidence tending to prove that defendant was very familiar with the operation of the murder weapon. He commented that the testimony to that effect, by Ibesa, was "absolutely uncontradicted." By this comment, the state could have been referring to a lack of contradictory testimony brought out in cross examination of Ibesa, as well as testimony by other witnesses who were allegedly present at the time defendant was handling the weapon. Therefore, we do not find that the trial court erred in not granting a mistrial based on this comment by the state.[7] *1121 Accordingly, we find that this assignment of error lacks merit.

ASSIGNMENT OF ERROR NUMBER EIGHT
Defendant argues that the trial court erred in instructing the jury. More particularly, he cites four different instances where he argues that the trial court committed reversible error in the jury instructions, when the trial court 1) refused to instruct the jury on negligent homicide, 2) failed to give two proffered instructions on circumstantial evidence, 3) gave an insufficient charge on manslaughter, and 4) refused to give defendant's preferred instruction on accomplice testimony.
The state argues to the contrary, that the instructions given by the trial court were clear and concise, covering the evidence presented at the trial and all responsive verdicts as required by law. The state argues that the charges were a correct reflection of the law and that they do not warrant reversal. We agree.
First, in considering defendant's complaint that the trial court failed to charge the jury on negligent homicide, we note that negligent homicide is not a responsive verdict to the charged offense, first degree murder. La.C.Cr.P. art. 814. It would be error for the jury to return a negligent homicide verdict. State v. Major, 597 So.2d 108 (La.App. 4th Cir.1992). Nevertheless, it has been held that, in cases involving various grades of murder, such as first degree murder, second degree murder or manslaughter, when there is evidence from which the jury can infer that defendant is guilty of negligent homicide, the trial court should charge the jury with defendant's requested special charges on the law of negligent homicide. State v. Marse, 365 So.2d 1319 (La.1978). The failure to give such an instruction, if warranted by the evidence, is prejudicial only if the jury has insufficient information to understand that if defendant were guilty only of negligent homicide, it should find him not guilty as to the charged offense or the responsive verdicts. State v. Marse, supra.
Here, the evidence would not support a verdict of negligent homicide. It was undisputed that defendant entered the restaurant with a gun for the purpose of robbing the restaurant. Defendant pointed the gun at the victim and demanded money. Kern was killed during the perpetration of that armed robbery, whether defendant had the specific intent to kill the victim or not, as argued by defendant. The weapon expert testified that the gun could not have discharged accidently. No one testified and there was no other evidence that the gun discharged accidentally. Thus, there was no evidence from which the jury could infer that defendant was guilty of negligent homicide. At best, the evidence could have supported the defense argument of the absence of specific intent to kill, a theory that the jury rejected. But even then, a second degree murder verdict would have been in order, not a verdict of negligent homicide. Therefore, we find no error in the trial court's decision to not charge the jury on negligent homicide.
Defendant argues, in one sentence, that the trial court erred in not giving his requested instructions on circumstantial evidence. However, he does not present argument as to what prejudice, if any, resulted from the trial court's refusal to give his proposed charges.
Our review of the charges on this point indicates that the charge that was given on circumstantial evidence was an accurate and proper statement of the law. Furthermore, the instruction given in this case has been challenged and any arguments as to its inadequacy have been squarely rejected. State v. McLemore, 26,106 (La.App. 2nd Cir. 6/24/94), 640 So.2d 847; State v. Flowers, 574 So.2d 448 (La.App. 2nd Cir.1991), writ denied, 580 So.2d 666 (La.1991); State v. Wiggins, 518 So.2d 543 (La.App. 5th Cir.1987), writ denied, 530 So.2d 562 (La.1988). Therefore, we find no error in the trial court's charge on circumstantial evidence.
*1122 Defendant also argues that the trial court erred in not giving his requested charge on manslaughter. More particularly, defendant cites as error, the trial court's refusal to instruct the jury that manslaughter occurs when there is a killing committed during the perpetration of the felony of illegal discharge of a weapon.
Read as a whole, the instructions given by the trial judge informed the jury that manslaughter is the killing of a human being without any intent to cause death or great bodily harm when the defendant is engaged in the perpetration of a felony other than armed robbery.[8]
Our review of the charges on this point indicates that the trial court's failure to charge the jury on illegal discharge of a weapon was not erroneous. This is clearly not a responsive verdict to the charge of first degree murder. The evidence of the armed robbery was conclusive and there was no evidence to reasonably infer that defendant was merely involved in the illegal discharge of a firearm when he killed Kern. Moreover, any imprecision in the jury charges in this regard was harmless in that the jury was given adequate instruction, without the special jury charge, to understand that if they found that defendant was not involved in the perpetration of an armed robbery when Kern was killed, then they should return a verdict of not guilty to the charge of first or second degree murder. Further, the record does not indicate, by jury question, that the jury was in any way confused by the charge. Thus, we find no reversible error in the trial court's refusal to give the defendant's requested charge on manslaughter.
Finally, defendant contends that the trial court erred in not giving his requested charge on accomplice testimony.
The state points out that a special charge need not be given if is included in the the general charge. La.C.Cr.P. art. 807. State v. Giles, 93-0103 (La.App. 4th Cir. 6/15/94), 639 So.2d 323, writ denied, 94-1891 (La. 12/19/94), 648 So.2d 399.
Here, the general charge included the essence of the special charge requested by the defense. The trial court cautioned the jury concerning false testimony by either state witnesses or defense witnesses and instructed them that they may disregard the testimony of any witness that they believe testified falsely. A more restrictive charge was not required here because the state's case did not rest solely on the uncorroborated testimony of an accomplice. State v. Murray, 375 So.2d 80 (La.1979).
As conceded by the defense, there was no question in this case as to whether the defendant killed Kern, but only whether he had the requisite mens rea to commit the offense. The charges in the case adequately covered burden of proof, criminal intent, the effects of alcohol and drugs and the necessary requirements for finding the responsive verdicts to the charged offense. We find no prejudice resulting to defendant in either the charges given or the ones refused. Accordingly, we find no merit in this assignment of error concerning the inadequacy of the jury instructions.

ERROR PATENT REVIEW
In reviewing this case for errors patent on the face of the record, we find that the sentencing transcript indicates that the trial court failed to grant defendant credit for time served as required by La.C.Cr.P. art. 880. Therefore, we order that the sentence be amended to give defendant credit for time served in actual custody prior to the imposition of sentence.
Accordingly, for the reasons set out above, we affirm defendant's conviction for first degree murder. Defendant's sentence to life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence is amended to give defendant credit for time served and, as amended, the sentence is affirmed.
*1123 CONVICTION AFFIRMED; SENTENCE AFFIRMED AS AMENDED.
CHIASSON, J., Pro Tem., concurs.
CHIASSON, Judge, Pro Tem., concurring.
I fully agree with the result reached in the majority opinion and therefore concur.
NOTES
[1] The Batson criteria are codified in La.C.Cr.P. art. 795 which provides in pertinent part:

C. No peremptory challenge made by the state or the defendant shall be based solely upon the race of the juror. If an objection is made that the state or defense has excluded a juror solely on the basis of race, and a prima facie case supporting that objection is made by the objecting party, the court may demand a satisfactory racially neutral reason for the exercise of the challenge, unless the court is satisfied that such reason is apparent from the voir dire examination of the juror. Such demand and disclosure, if required by the court, shall be made outside of the hearing of any juror or prospective juror.
D. The court shall allow to stand each peremptory challenge exercised for a racially neutral reason either apparent from the examination or disclosed by counsel when required by the court. The provisions of Paragraph C and this Paragraph shall not apply when both the state and the defense have exercised a challenge against the same juror.
E. The court shall allow to stand each peremptory challenge for which a satisfactory racially neutral reason is given. Those jurors who have been peremptorily challenged and for whom no satisfactory racially neutral reason is apparent or given may be ordered returned to the panel, or the court may take such other corrective action as it deems appropriate under the circumstances. The court shall make specific findings regarding each such challenge.
[2] Because of publicity surrounding the case, the jurors were chosen from the Lafayette area and transported to Jefferson Parish for the trial. However, the record before us is incomplete regarding the various motions, minute entries and judgments which lead up to this result.
[3] Under La.C.Cr.P. art. 800, as amended in 1983, a defendant is permitted to complain on appeal of a trial court ruling in which the court refused to sustain his challenge for cause, even if he does not thereafter exercise all of his peremptory challenges. However, in such a case, he must show prejudice, affecting substantial rights of the accused (La.C.Cr.P. art. 921), for the conviction to be reversed on those grounds. State v. Robertson, 94-2660 (La. 1/14/94), 630 So.2d 1278.
[4] The holding in Witherspoon, as interpreted in Witt, is incorporated into La.C.Cr.P. art. 798, which provides, in pertinent part:

It is good case for challenge on the part of the state, but not on the part of the defendant, that:
(2) The juror tendered in a capital case who has conscientious scruples against the infliction of capital punishment and makes it known:
(a) That he would automatically vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before him;
(b) That his attitude toward the death penalty would prevent or substantially impair him from making an impartial decision as a juror in accordance with his instructions and his oath; or
(c) That his attitude toward the death penalty would prevent him from making an impartial decision as to the defendant's guilt ...
[5] Trial counsel objected to the introduction of the statement because of lack of notice to the defense. However, we note that trial counsel was not defendant's original attorney and was not the attorney who made the pre-trial discovery request.
[6] While we understand defense counsel's desire to zealously represent his client, we also find the insinuation, without a factual basis, that Ibesa received a favorable deal by the Jefferson Parish District Attorney's Office because he hired an attorney who has an associate in the firm who is related to a Supreme Court Justice, not only irrelevant, but improper and bordering on grounds for sanction.
[7] In brief, defendant makes a passing reference to other comments by the state concerning "uncontradicted" evidence. We note that there was no contemporaneous objection to these comments. Further, when objection was made to the trial court after the fact and an admonishment was requested by the defense, the trial court agreed to admonish the jury that the defense has no burden to present any witnesses or put on any evidence and, any inference which they may have drawn to the contrary from the state's remarks is erroneous. Defendant made no further objection.
[8] In the charge, the trial judge only described the manslaughter felonies as those other than the ones enumerated in the first and second degree murder statutes. But since the only felony the trial judge listed in charging the jury on first and second degree murder was the felony of armed robbery, the implication of the charge taken as a whole was that the manslaughter felonies were those other than armed robbery.