901 So.2d 513 (2005)
STATE of Louisiana
v.
Kellen PARKER.
No. 04-KA-1017.
Court of Appeal of Louisiana, Fifth Circuit.
March 29, 2005.
*516 Paul D. Connick, Jr., District Attorney, Twenty-Fourth Judicial District, Parish of Jefferson, Terry M. Boudreaux, Andrea F. Long, Cameron M. Mary, Donald A. Rowan, Jr., Assistant District Attorneys, Gretna, LA, for Plaintiff/Appellee.
Margaret S. Sollars, Louisiana Appellate Project, Thibodaux, LA, for Defendant/Appellant.
Panel composed of Judges SOL GOTHARD, JAMES L. CANNELLA, and WALTER J. ROTHSCHILD.
WALTER J. ROTHSCHILD, Judge.
Defendant, Kellen Parker, was indicted by a Jefferson Parish grand jury on August 1, 2002, with first degree murder, in violation of LSA-R.S. 14:30. Dustin Dressner was likewise indicted with first degree murder, while Troy Arnaud was indicted with second degree murder, in violation of LSA-R.S. 14:30.1.[1] Defendant pled not guilty and filed various pre-trial motions, including Defendant's Request for Bill of Particulars and for Discovery and several motions to quash the indictment. Defendant's motions to quash the indictment were denied on January 23, 2003, May 1, 2003, and August 18, 2003.
On November 17, 2003, defendant's trial commenced with jury selection, and another motion to quash the indictment was reurged and denied. Thereafter, defendant filed a Motion and Order for Supervisory Writs with Request for Stay Order. This Court denied the writ on November 18, 2003, finding no error in the trial court's ruling denying the motion to quash.[2] On November 19, 2003, the jury was sworn in.
Defendant was found guilty as charged on November 22, 2003. The following day, and before commencement of the penalty phase, defendant moved for a mistrial, but this motion was denied. The jury later returned a split verdict; as a result, on December 16, 2003, defendant was sentenced to life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. This appeal follows.

FACTS
At trial, Troy Arnaud testified that on June 6, 2002, Dustin Dressner (also known as "Shorty") picked him up and later picked up defendant, Kellen Parker, from Billy Rumsfield's house on Taffy Street. Troy had known defendant since elementary school; however, Dustin and defendant met for the first time that day. The three drove around and went to Dustin's friend's house in Westwego and later to his girlfriend's apartment complex. Troy and defendant stayed in the car while Dustin went inside his girlfriend's apartment. Both Troy and defendant testified that when Dustin returned to the car, he appeared upset. After leaving, the three went to pick up money from Troy's girlfriend, Amy Rome, at her apartment in Marrero. When Troy went inside, Dustin followed him to get a knife from the kitchen drawer to fix his radio. After leaving Amy's apartment, they drove to a store and Troy went inside to get some Cisco wine.
According to Troy, Dustin then claimed he was going to a friend's house and asked "was we about hurting somebody," and defendant responded that he was "about *517 whatever; it don't matter." After arriving at a house in Oak Cove, defendant and Dustin went to the front door and Troy remained in the car.
According to Shannon Fasullo, at approximately 11:30 p.m., her husband, Paul Fasullo, and their daughter, Samantha, were asleep when she heard a knock on the door. She answered the door and saw a black male and Dustin, who is a white male. Dustin asked if Shannon's nephew, Michael, was there and if he could come inside. To both questions, Shannon answered no.
After hearing glass break, Troy looked to the doorway and saw Dustin holding a broken Cisco wine bottle and defendant attacking Shannon. After Shannon got up and ran, Troy witnessed defendant, who is a black male, run after her. Shannon testified that the black male attacked her repeatedly while she called for Paul. She finally got to her feet and went into the bedroom and noticed Paul in the doorway fighting with Dustin over a knife. After picking up her daughter from the bed, she called 911 before being attacked again and suffering numerous more stab wounds. Shannon locked herself in the bathroom; however, the door was kicked open, and she was stabbed several more times.
Minutes later, defendant came out of the house with a pink piggybank, and Dustin followed holding his shirt with blood covering his chest. Troy testified that Dustin got into the front passenger seat, pointed a knife at him, and ordered him to drive. Troy drove them out of the neighborhood, pulled over at Marrero's Discount Store, and then the three began to run. However, Dustin went back for his car.
Deputy Robert Pellegrin responded to a call regarding this incident at 5313 Tulip Court, and Deputies Thompson and Mendez were already at the scene. Upon entering the residence, he testified that he observed a red fluid similar to blood and broken glass at the doorway, a crying baby covered in blood, and what appeared to be a deceased body with multiple stab wounds. Deputy Pellegrin testified that he proceeded to the master bedroom and found Deputy Mendez with Shannon, who was lying on the floor in a pool of blood, suffering from multiple stab wounds. He was able to obtain a partial description of the perpetrators from her. A broken knife blade and a watch were left at the scene, and a bloody footprint remained on the bathroom door.
Detective David Morales testified that he observed a paper bag with some broken glass in it, a bottle neck, and a pair of ladies' eyeglasses in the foyer of the residence. He saw the victim in the hallway and a blood-like substance on the floor leading to the hallway. He noticed a bathroom door with footprints on it that appeared to have been forced open, a broken man's wristwatch,[3] and a silver knife blade. Forensic evidence was collected.
At the hospital, Sergeant Thornton and Detective Kline interviewed Shannon and, in her first statement, she gave general descriptions of the two attackers and indicated that she recognized the white male as someone connected to an individual who knew her nephew. Based on the interview, officers spoke with her nephew, Michael Fasullo, who gave the name of another individual, Brandon Sapier, who was also interviewed. Dustin became a suspect and his photograph was included in a line-up. Shannon identified Dustin as the white male who attacked her. However, Shannon did not get a good look at the black male who attacked her and, therefore, could not identify him.
*518 On the morning of June 7, 2002, Sergeant Thornton and Detective Morales went to Dustin's house to arrest him and observed him next to his car, which contained a blood-like substance, with a bottle of peroxide and a towel. Dustin was arrested and his clothes and shoes were seized.
Dustin admitted that he was involved in the killing of the victim. He also assisted in identifying relevant addresses and in locating physical evidence, such as a knife with a bent blade and a knife handle with a piece of knife attached.[4] Troy and defendant were identified as additional perpetrators.
Troy testified that, on the day after the incident, he met up with defendant while walking toward Billy Rumsfield's house on Taffy Street and defendant told him a man and woman got hurt but "we ain't did nothing to a little child." Later that evening, both Troy and defendant were arrested at Billy's house. Billy's mother turned over clothes she believed to be defendant's which contained blood-like substances on them. While giving a statement to Detective Morales, defendant positively identified these clothes as the clothes he was wearing on the night of the incident. His tennis shoes were also seized.
Defendant testified that he got out of the car only to use the bathroom, and once Dustin started to attack Shannon, he tried to assist her by holding him back. He admitted that the footprint on the door was his from his attempt to close the door on Dustin's hand. Defendant denied knowing anything about a piggybank,[5] carrying a knife that night, and stabbing either Paul or Shannon. In fact, defendant claimed he never saw Paul. Defendant explained that he only confessed to stabbing Shannon in his statement because Detective Morales told him she said he had stabbed her and he did not know why she would lie. Defendant admitted that he was the black male standing at the door that night and that blood from both of the victims was found on the clothes he wore that night because of his struggle with Dustin.
Dr. Susan Garcia, an expert in the field of forensic pathology, performed an autopsy on the homicide victim, Paul Fasullo, and testified that he sustained injuries primarily to the head and neck region, with the lethal stab wound being to his upper chest which caused internal bleeding.

DISCUSSION
In his first assignment of error, defendant contends that his motions to quash the indictment should have been granted, because the indictment failed to include the aggravating circumstances that the State intended to present for consideration by the petit jury. The State responds that the short form of the indictment used was in compliance with the law, and that defendant had sufficient notice of the circumstances of the charge against him.
Article I, § 13 of the Louisiana Constitution provides that an indictment shall inform a defendant of the nature and cause of the accusation against him. State v. Thibodeaux, 98-1673 (La.9/8/99), 750 So.2d 916, 930, cert. denied, 529 U.S. 1112, *519 120 S.Ct. 1969, 146 L.Ed.2d 800 (2000); State v. Richtofen, 01-500 (La.App. 5 Cir. 11/27/01), 803 So.2d 171, 192. This concept is implemented in LSA-C.Cr.P. art. 464:
The indictment shall be a plain, concise, and definite written statement of the essential facts constituting the offense charged. It shall state for each count the official or customary citation of the statute which the defendant is alleged to have violated. Error in the citation or its omission shall not be ground for dismissal of the indictment or for reversal of a conviction if the error or omission did not mislead the defendant to his prejudice.
However, LSA-C.Cr.P. art. 465 authorizes the use of specific short form indictments in charging certain offenses, including first degree murder. LSA-C.Cr.P. art. 465(A)(31). The constitutionality of short form indictments has been upheld by the Louisiana Supreme Court. See State v. Baylis, 388 So.2d 713, 718-719 (La.1980); State v. Liner, 373 So.2d 121, 122 (La.1979). When short forms are used, it is intended that further details as to the statutory method by which he committed the offense may be procured by defendant through a bill of particulars. State v. Thibodeaux, supra; State v. Richthofen, supra at 193.
In the instant case, the State charged Kellen Parker by bill of indictment, which provided in pertinent part that Mr. Parker and his co-defendant, Dustin Dressner, "on or about the 6th day of June in the year of our Lord, Two Thousand and Two .... violated R.S. 14:30 in that they did commit first degree murder of Paul Fasullo...." The indictment reflects that defendant was charged in compliance with LSA-C.Cr.P. art. 465(A)(31).
Moreover, contrary to defendant's contentions, he was notified prior to trial of the aggravating circumstances alleged by the State. Defendant filed a request for bill of particulars and for discovery, and the State responded by filing an initial and supplemental notice of discovery and a notice of intent to rely on aggravating circumstances. Specifically, on January 23, 2003, the State, orally and through pleadings, indicated that it would rely on the aggravating circumstances set forth in LSA-C.Cr.P. arts. 905.4(1), 905.4(4), and 905.4(7). Defense counsel even declared to the court that discovery motions were satisfied. Moreover, the State provided defendant with open-file discovery. Open file discovery relieves the State of the necessity of answering a motion for a bill of particulars. State v. Noil, 01-521 (La.App. 5 Cir. 12/26/01), 807 So.2d 295, 309, writ denied, 02-0276 (La.10/25/02), 827 So.2d 1177.
Defendant cites Apprendi,[6]Ring[7] and Jones,[8] along with the Fifth and Fourteenth Amendments to the United States Constitution in support of his argument that all aggravating factors to be charged at the guilt phase and aggravating circumstances to be charged in the penalty phase must be presented to and returned by a properly constituted grand jury. Defendant contends that any factor that increases the maximum penalty for a crime is an essential element of the crime and, accordingly, must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt. The State responds, however, that the Jones requirement that *520 any fact other than prior convictions which increases the maximum penalty for a crime must be charged in the indictment applies only to federal prosecutions, citing United States v. Cotton, 535 U.S. 625, 627, 122 S.Ct. 1781, 152 L.Ed.2d 860 (2002) and U.S. v. Gillon, 348 F.3d 755, 757 (8th Cir.2003).
We have reviewed Jones, Apprendi and Ring, and we note that these cases are distinguishable from the instant case. In Jones v. United States, 526 U.S. 227, 119 S.Ct. 1215, 143 L.Ed.2d 311 (1999), the defendant committed a carjacking which resulted in one victim suffering serious bodily injury. The defendant was charged under a federal statute that provided for a higher penalty range if the offense involved serious bodily harm or death. The indictment and jury instructions did not include facts or subsections regarding the "serious bodily harm" element of the offense, and this element was not found by the jury. As a result, the defendant's conviction and sentence, which was based on this element, were reversed, because this element of the offense was not charged in the indictment, submitted to the jury, and proven beyond a reasonable doubt. In the present case, however, the jury found defendant guilty as charged of first degree murder, which included the aggravating circumstances. Therefore, the jury found that all elements of the offense were proven beyond a reasonable doubt.
In Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), petitioner fired several shots into the home of an African-American family and made a statement which he later retracted that he did not want the family in his neighborhood because of their race. He was charged under New Jersey law with second degree possession of a firearm for an unlawful purpose, which carried a prison term of five to ten years. After petitioner pled guilty, the prosecutor filed a motion to enhance the sentence. The court found that the shooting was racially motivated and sentenced him to a twelve-year term. The Supreme Court held that the Constitution required that any fact which increases the penalty for a crime beyond the prescribed statutory maximum, other than the fact of a prior conviction, must be submitted to a jury and proved beyond a reasonable doubt. In the present case, the trial judge did not make any post-verdict findings to enhance defendant's sentence; therefore, this case is distinguishable.
In Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), the defendant was sentenced to death after being convicted of felony murder which occurred during the perpetration of an armed robbery. This case involved the Sixth Amendment right to a jury trial in capital prosecutions. Under Arizona law, after a jury adjudicates that a defendant is guilty of first degree murder, the trial judge alone determines the presence or absence of the aggravating factors required by law for imposition of the death penalty. In Ring, the defendant's sentence and conviction were reversed because the sentencing judge sitting without a jury may not find an aggravating circumstance required to impose the death penalty. However, this case is distinguishable from the present case. In the present case, it was the jury who determined that aggravating factors were present to find defendant guilty of first degree murder, and the jury likewise had the responsibility to consider aggravating factors and mitigating factors in the penalty phase of trial.
Also, in Blakely v. Washington, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004), the defendant pled guilty to kidnapping and the facts admitted in his plea *521 supported a maximum sentence of fifty-three months; however, pursuant to state law, the court imposed an "exceptional" sentence of ninety months after making a judicial determination that the defendant acted with "deliberate cruelty." The issue in Blakely involved whether this sentence enhancement violated the defendant's Sixth Amendment right to trial by jury. The Supreme Court considered the holdings in Apprendi and Ring, recognizing that the facts supporting the sentence enhancement were neither admitted by the defendant nor found by a jury, and noted that "the relevant `statutory maximum' is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose without any additional findings." Id. at 2537 (emphasis in the original). The defendant's sentence was declared invalid because it failed to comply with the Sixth Amendment. This case is distinguishable from the present case in that the trial judge did not find an aggravating factor to enhance defendant's sentence.
In the present case, defendant did not receive the maximum penalty possible for first degree murder under LSA-R.S. 14:30. Instead of receiving the death penalty, defendant received a life sentence. The trial judge did not make additional findings that were not considered by the jury. The subsections of LSA-R.S. 14:30 define first degree murder and include the aggravating factors making it a capital offense. The jury found defendant guilty as charged after considering these elements. Defendant argues that the grand jury had the responsibility of finding the specific intent element as well as an aggravating element in this capital murder case. He adds that because the grand jury proceedings were secret, "there was no way to be assured that this was correctly done." However, defendant offers no evidence, nor does the record reflect, that the grand jury's findings were defective in that aggravating circumstances were not considered.
A denial of a motion to quash should not be reversed on appeal unless the trial court clearly abused its discretion. State v. Quinones, 03-907 (La.App. 5 Cir. 12/30/03), 864 So.2d 824, 828. Considering the record before us, we find that defendant was sufficiently informed of the charge against him in the indictment and through open-file discovery, and he was not prejudiced by any defect in the indictment at trial. Accordingly, the trial court did not abuse its discretion in denying defendant's motion to quash the indictment, and this assignment of error is without merit.
In his second assignment of error, defendant argues that the trial court committed reversible error by not ruling that the State was eliminating jurors on the basis of race and denying his Batson[9] challenge. He claims the exercise of peremptory challenges to exclude all of the black jurors constituted a prima facie case of discrimination. Defendant further contends that meaningful black participation in the deliberations of this case was denied after the State gave "bogus reasons" for striking these jurors which violated the appellant's right to be tried by a jury selected on non-racial criteria. Specifically, defendant challenges the excusal of Debra Bush,[10] Reaun Paige, Jerri Sue Karagul, Nicholle Chopin, and Angela Davis. *522 The State responds that the trial court properly found that the State established a race-neutral explanation for striking each of the individuals in question. It further recognizes the great deference accorded the trial judge in a denial of a Batson challenge.
The United States Supreme Court held in Batson that the Equal Protection Clause prohibits the peremptory challenge of a prospective juror based on race. State v. Robinson, 02-1869 (La.4/14/04), 874 So.2d 66, 84, cert. denied, ___ U.S. ___, 125 S.Ct. 658, 160 L.Ed.2d 499 (2004). LSA-C.Cr.P. art. 795(C), likewise, provides that no peremptory challenge shall be made based solely on the juror's race. Subsection (C) further provides the following:
If an objection is made that the state or defense has excluded a juror solely on the basis of race, and a prima facie case supporting that objection is made by the objecting party, the court may demand a satisfactory racially neutral reason for the exercise of the challenge, unless the court is satisfied that such reason is apparent from the voir dire examination of the juror. Such demand and disclosure, if required by the court, shall be made outside of the hearing of any juror or prospective juror.
In Batson, the Supreme Court supplied a three-step analysis to determine whether the jury selection was made in an impermissibly discriminatory manner. First, a defendant must establish a prima facie case of discrimination by presenting facts and relevant circumstances that raise an inference that the prosecutor used peremptory challenges to exclude potential jurors based on their race. State v. Kirsch, 04-214 (La.App. 5 Cir. 7/27/04), 880 So.2d 890, 896. Second, once a prima facie case is established, the State then bears the burden to provide race-neutral explanations for its peremptory challenges. Id.; Purkett v. Elem, 514 U.S. 765, 767, 115 S.Ct. 1769, 1771, 131 L.Ed.2d 834, 839 (1995). Third, if the State provides race-neutral explanations, the trial court must determine whether the opponent of the strike has carried his burden of proving purposeful discrimination. State v. Jones, 98-842 (La.App. 5 Cir. 2/10/99), 729 So.2d 57, 62.
The defendant bears the ultimate burden of persuasion to prove purposeful discrimination. State v. Kirsch, supra at 898. The question becomes "whether the defendant's proof, when weighed against the prosecutor's proffered race-neutral reasons, is sufficient to persuade the trial court that such discriminatory intent is present." State v. Hobley, 98-2460 (La.12/15/99), 752 So.2d 771, 783, cert. denied, 531 U.S. 839, 121 S.Ct. 102, 148 L.Ed.2d 61 (2000). To determine discriminatory intent, the trial court should consider all other statements or actions by the prosecutor during the course of voir dire. Id.
In State v. Toussant, 98-1214 (La.App. 5 Cir. 5/19/99), 734 So.2d 961, 964, writ denied, 99-1789 (La.11/24/99), 750 So.2d 980, this Court stated:
A trial judge's determination pertaining to purposeful discrimination rests largely on credibility evaluations, so his findings are entitled to great deference by the reviewing court. The trial judge, advantaged by observing the characteristics and demeanor of the attorneys and prospective jurors, occupies the best position for deciding whether a discriminatory objective underlies peremptory challenges. (citations omitted)
Credibility can be measured by, among other factors, the prosecutor's demeanor, how reasonable or improbable the explanations are, and whether the proffered *523 rationale has some basis in accepted trial strategy. State v. Kirsch, supra at 896.
A single instance of race discrimination in the jury selection process not identified and corrected by the trial court constitutes reversible error. State v. Lewis, 01-155 (La.App. 5 Cir. 8/28/01), 795 So.2d 468, 471, writ denied, 01-2682 (La.8/30/02), 823 So.2d 939. In the present case, defendant made a Batson challenge after the State excused Angela Davis, noting that the prosecutor had exercised peremptory challenges on every black juror in the two panels examined. The trial court agreed that a pattern existed,[11] and the State then provided its reasons for excusing these jurors.
The State expressed that it excused Delisa Bush because she shook her head and rolled her eyes while two other prospective jurors, Ms. Smith and Ms. Falcon, were being questioned. Because of this, the State did not believe she would listen to the opinions of others or be able to deliberate fairly. With regard to Reaun Paige, the State noted that she failed to change her posture during its presentation and crossed her arms while leaning to one side; however, when defense counsel stood up, she leaned forward and was receptive to what he was stating.
When accepted by the trial judge, the exercise of a peremptory challenge based upon a prospective juror's body language does not violate Batson. State v. Hoffman, 98-3118 (La.4/11/00), 768 So.2d 542, 559, cert. denied, 531 U.S. 946, 121 S.Ct. 345, 148 L.Ed.2d 277 (2000). In addition, perceived hostility, lack of interest and unresponsiveness are race-neutral reasons for excluding potential jurors. State v. Duplessy, 03-185 (La.App. 5 Cir. 7/29/03), 853 So.2d 77, 82, writ denied, 03-2416 (La.2/6/04), 865 So.2d 739.
Additionally, Ms. Paige's profession was credit card collections and the State wanted to dismiss her based on past dealings with individuals of this profession. Challenges based upon the potential juror's profession have been upheld as race-neutral. Id. Further, Ms. Paige's questionnaire indicated that she was generally opposed to the death penalty. A juror's views or perceived views on imposition of the death penalty may constitute a sufficient race-neutral explanation. State v. Durham, 94-1036 (La.App. 5 Cir. 4/16/96), 673 So.2d 1103, 1112. Accordingly, based on the explanations provided by the State as well as the law on this issue, we find that the trial court did not err in ruling that Ms. Bush and Ms. Paige were excused for race-neutral reasons.
With regard to Angela Davis, the State indicated that she was excused due to her indecisiveness. It initially tried to strike her during the Witherspoon[12] examination, after she indicated on her questionnaire that she would always vote for imposing the death penalty and later expressed that she could never vote for it. *524 However, the court found that she was rehabilitated. As stated above, a juror's views on imposing the death penalty may be a sufficient race-neutral reason for excluding the juror. State v. Durham, supra. Further, concern about inconsistent answers can form the basis for a race-neutral explanation. See State v. Hoffman, supra at 559. The record shows Ms. Davis' views on the death penalty and confirms her indecisiveness. Accordingly, we find that the trial court was correct in denying the Batson challenge as to Ms. Davis.
As to Nicholle Chopin, the State also tried to strike her during the Witherspoon examination. The State argued that although she failed to respond to the questionnaire, she was anti-death penalty. However, Ms. Chopin admitted to defense counsel that she could consider imposing the death penalty in certain situations such as the bombings of the World Trade Center and in Oklahoma City. As noted previously, weak responses regarding the imposition of the death penalty or indecisiveness are appropriate race-neutral reasons to exercise peremptory challenges. State v. Durham, supra. Based on her inconsistent responses regarding the death penalty, the State had race-neutral reasons for excusing Ms. Chopin. Therefore, we find that defendant's Batson challenge as to Ms. Chopin was properly denied.
According to the record, Jerri Sue Karagul was not included in the Batson challenge of defendant. Defendant failed to object at the time Ms. Karagul was excused; in addition, her name was not mentioned during the Batson challenge process. Defense failed to initiate the three-step Batson procedure; as a result, the State did not offer race-neutral reasons for challenging Ms. Karagul, and the trial court did not rule on this issue. Therefore, the State contends that this issue has been waived.
The Louisiana Supreme Court has consistently held that when a defendant fails to timely raise an objection to irregularities in the jury selection process, review of those irregularities are waived. State v. Snyder, 98-1078 (La.4/14/99), 750 So.2d 832, 840. Because defendant failed to object when Ms. Karagul was excused, he has waived this issue. However, we note that even if this issue had been preserved for appeal, the record reflects race-neutral reasons as to why Ms. Karagul was excused. At the time of the jury selection process, Ms. Karagul was under two separate subpoenas, including one pending misdemeanor criminal charge. It is reasonable that the State could feel that she would be biased against it or distracted by her upcoming court appearances. A prospective juror's criminal background may serve as a sufficient race-neutral explanation. State v. Banks, 96-652 (La.App. 5 Cir. 1/15/97), 694 So.2d 401, 408.
After the State provided its reasons for striking these individuals, the Court expressed "I think he's given race neutral reasons that I can independently verify from looking at the prospective jurors throughout voir dire." The trial judge was in the best position to examine the State's sincerity in its race-neutral explanations for challenging prospective jurors. Considering that a trial judge's determinations regarding purposeful discrimination rest largely on credibility evaluations and that great deference is given to the trial judge in making this determination, we find that the trial court did not err in denying defendant's Batson challenges. Accordingly, this assignment of error is without merit.
In his third assignment of error, defendant contends that the trial court erred in not declaring a mistrial when it learned that a juror, Charles Boudreaux, *525 should have been excused for cause. Defendant explains that if Mr. Boudreaux had been entirely truthful during voir dire regarding his mental and criminal history, he would have been deemed unqualified to serve and would have been excused for cause.
The State responds that even if the motion for mistrial had been granted, the result would have been to seat an alternate juror for the penalty phase and would not have affected the guilt phase. The State also contends that the trial court did not abuse its discretion in denying the motion and that defendant cannot demonstrate prejudice. The State further provides that defendant cannot demonstrate that Mr. Boudreaux was incapable of serving as a juror because of a mental infirmity or that he should have been disqualified based on his criminal history. Finally, the State argues that defendant refused to remove the juror and seat an alternate for the penalty phase and, therefore, should not be allowed to contest this issue on appeal.
After the guilt phase of the trial, but before the penalty phase commenced, Charles Boudreaux brought an issue to the court's attention regarding his shirt. According to Mr. Boudreaux, he noticed small holes in his two-month old shirt and did not know what happened to it, but he assumed it occurred when he left his hotel room. He explained that nothing else in his room seemed disturbed and assured the court that although this concerned him, it would not affect his ability to be fair and impartial. He stated that he had not discussed this issue with other jurors.
Later, defense counsel informed the court that one of the defense's mitigating witnesses for the penalty phase, Cy Trosclair, was Mr. Boudreaux's first cousin. Mr. Trosclair was defendant's next door neighbor and told defense counsel that Mr. Boudreaux was a "loose cannon," had attacked his mother several times with a knife, and had been in and out of "Revar" (phonetically) and other institutions. Mr. Trosclair explained that they were not talking because of something that occurred with Mr. Boudreaux's wife, and added that Mr. Boudreaux was uncontrollable as a child. Mr. Boudreaux admitted that Mr. Trosclair was his first cousin and that he had not spoken to him in approximately nine months; however, he assured the court that he would not be affected by this.
The State moved to excuse Mr. Boudreaux from the jury, but the trial judge stated that he was disinclined to strike Mr. Boudreaux for cause unless there was a joint motion. After examining Mr. Boudreaux's criminal history, it was determined that Mr. Boudreaux had some juvenile offenses, misdemeanor arrests and one felony arrest; however, the charges for the felony arrest were refused. Defendant did not join in the motion to excuse Mr. Boudreaux and replace him with an alternate for the penalty phase. Rather, defendant moved for a mistrial, stating that because of his criminal record, the shirt issue, his relationship with Mr. Trosclair and the fact that he knew the Fasullos,[13] he should have never been on the jury.
The trial court denied defendant's motion for mistrial, finding that Mr. Boudreaux's criminal record did not rise to the level required for disqualification. The court explained that he did not have any felony convictions, no one asked him about his criminal history, and he did not think he lied about it during voir dire. The trial court determined that Mr. Boudreaux's relationship *526 with the witness was not alone sufficient to disqualify him. The court further noted that Mr. Boudreaux stated he could be fair and impartial.
A mistrial is a drastic remedy and, except when mandatory, is warranted only when the defendant has suffered substantial prejudice such that he is incapable of receiving a fair trial. State v. Carmouche, 01-0405 (La.5/14/02), 872 So.2d 1020, 1035; State v. Johnson, 03-620 (La.App. 5 Cir. 10/28/03), 860 So.2d 180, 186, writ denied, 03-3171 (La.3/19/04), 869 So.2d 849. According to LSA-C.Cr.P. art. 775, a mistrial may be ordered and the jury dismissed when false statements of a juror during voir dire examination prevent a fair trial. LSA-C.Cr.P. art. 775(6). Whether a mistrial should be granted is within the trial court's sound discretion and denial of a mistrial motion will not be disturbed on appeal absent an abuse of that discretion. State v. Ratcliff, 98-101 (La.App. 5 Cir. 2/23/99), 731 So.2d 356, 363, writ denied, 99-1112 (La.9/3/99), 747 So.2d 541.
To qualify to serve on a jury, a person must "[n]ot be under interdiction or incapable of serving as a juror because of a mental or physical infirmity...." LSA-C.Cr.P. art. 401(A)(4). A prospective petit juror may be disqualified when doubt exists as to that juror's competency to serve in the case. LSA-C.Cr.P. art. 787. Additionally, to serve on a jury a person must not be under indictment for a felony nor have been convicted of a felony for which he has not been pardoned. LSA-C.Cr.P. art. 401(A)(5).
In the instant case, as found by the trial court, Mr. Boudreaux did not have any felony convictions. Also, no evidence was presented to confirm that Mr. Boudreaux suffered from some mental infirmity. The trial court questioned the only witness that stated he was a "loose cannon," and the shirt incident is not sufficient to justify his disqualification. The holes in the shirt could have been caused by various means, all of which have nothing to do with the juror's mental stability. The fact that Mr. Boudreaux was the first cousin of a mitigating witness during the penalty phase is not sufficient grounds for disqualification since he stated his ability to remain impartial.
The record does not reveal sufficient grounds to disqualify Mr. Boudreaux. Moreover, even if he could have been excused for cause, defendant failed to demonstrate that he questioned the juror regarding his mental and criminal history during voir dire and that the juror made false statements while examined. Further, there is no indication in the record that defendant was prejudiced by Mr. Boudreaux serving as a juror, and no evidence was presented that defendant did not receive a fair trial. Because no evidence of mental incapacities was presented at trial, defendant cannot argue such a condition existed and caused him prejudice.
Finally, during the guilt phase of trial, Mr. Boudreaux did not know that his cousin would be a mitigating witness for defendant and, therefore, the relationship did not prejudice defendant for the guilt phase. Moreover, after the relationship was discovered, the jury reached a split verdict and defendant was ultimately sentenced to life imprisonment. Defendant cannot complain that the relationship prejudiced him in the penalty phase since he received the lesser sentence and declined to replace him with an alternate for the penalty phase when he had an opportunity to do so. Accordingly, this assignment of error is without merit.
The record was reviewed for errors patent, according to LSA-C.Cr.P. art. 920; State v. Oliveaux, 312 So.2d 337 (La.1975); *527 and State v. Weiland, 556 So.2d 175 (La.App. 5 Cir.1990). No errors requiring corrective action were noted.

DECREE
For the reasons set forth above, we affirm defendant's conviction and sentence.
AFFIRMED.
NOTES
[1] Pursuant to a plea agreement with the State, Troy Arnaud pled guilty to accessory after the fact of first degree murder.
[2] Defendant also sought review of this ruling by the Louisiana Supreme Court, but the Supreme Court denied the writ application. See State v. Parker, 03-3186 (La.11/19/03), 860 So.2d 537.
[3] It was stipulated that the watch left at the scene belonged to Dustin.
[4] Timothy Scanlan, an expert in the field of general forensics and tool mark analysis, testified with one-hundred percent certainty that the two pieces of knife, the blade found at the crime scene and the handle, were originally one in the same. Amy Rome identified the knife as hers.
[5] Shannon described missing jewelry and told the officers that the piggybank contained $40 to $50. Troy was able to take the police to the location of the piggybank.
[6] Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000).
[7] Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002).
[8] Jones v. United States, 526 U.S. 227, 119 S.Ct. 1215, 143 L.Ed.2d 311 (1999).
[9] Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).
[10] Although defendant questions the excusal of Debra Bush, the record reflects that Delisa Bush was the only potential juror with that last name in the first panel. Accordingly, we examine the excusal of Delisa Bush.
[11] A trial judge's demand that a prosecutor justify his peremptory strikes is tantamount to a finding that the defense has presented evidence to meet its initial burden in step one, or that a prima facie case of discrimination has been made. State v. Green, 94-0887 (La.5/22/95), 655 So.2d 272, 288.
[12] Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). During Witherspoon questioning, if a prospective juror's views on the death penalty are such that they would "prevent or substantially impair the performance of duties in accordance with the instructions [or] the oath," whether those views are for or against the death penalty, he or she should be excused for cause. State v. Taylor, 99-1311 (La.1/17/01), 781 So.2d 1205, 1214, cert. denied, 534 U.S. 844, 122 S.Ct. 106, 151 L.Ed.2d 64 (2001).
[13] Mr. Boudreaux admitted that he knew the victim through a previous job, but this would not affect his ability to be fair and impartial.